UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ASPIRE HEALTH PARTNERS, INC.,

     Plaintiff,

v.                                   Case No.  6:24-cv-1578-JSS-EJK

ASPIRE MGT LLC,

     Defendant.

_____/

**ORDER**

     Plaintiff, Aspire Health Partners, Inc. (Aspire), moves for a preliminary injunction.  (Motion, Dkt. 16.)  Defendant, Aspire MGT LLC (AML), opposes the Motion.  (Dkt. 28.)  The court held an evidentiary hearing on the Motion on November 6, 2024.  (Dkt. 47.)  Upon consideration, and for the reasons outlined below, the Motion is granted in part and denied in part.

**FINDINGS OF FACT**

     Plaintiff is a Florida not-for-profit corporation that has provided various healthcare services within Florida for more than a decade, including "various mental health services, health assessments and screenings, substance detoxification[,] and substance abuse services."  (Dkt. 1-1 at 4.)  Plaintiff also provides "clinical and pharmaceutical services" and "coordinates other medical care services for its patients," which "includes arranging for patients to be placed in nursing homes and assisted

living facilities." (*Id.*)  To conduct its business, Plaintiff maintains a website located at www.aspirehealthpartners.com.  (*Id.* at 11.)

At issue are six Florida trademark registrations held by Plaintiff, which include two separate registrations for each of three related marks.  Specifically, Plaintiff holds trademarks for ASPIRE HEALTH PARTNERS (Reg. Nos. T19000000125 and T19000000126), ASPIRE HEALTH (Reg. Nos. T19000000185 and T19000000186), and ASPIRE (Reg. Nos. T21000000273 and T21000000274).  (*Id.* at 26–39; 41–65; 58–66; 68–75; 77–90; 92–108.)  For each trademark, Plaintiff holds one registration for use of the mark "for providing case management services," such as "coordinating medical, behavioral[,] and social services," and another registration for use of the mark for a broader range of health services, especially those related to substance abuse and mental health treatment.  (*See id.* at 5–10.)  However, Plaintiff's registrations for ASPIRE HEALTH PARTNERS and ASPIRE HEALTH expressly disclaim any rights in the words "health" and "partners."  (*See* Dkt. 30-7 at 2, 8; Dkt. 30-8 at 1; Dkt. 30-9 at 2, 9; Dkt. 30-10 at 2, 8.)

Defendant is a Florida limited liability company that was incorporated in July 2023.[1]  After its incorporation, Defendant began rapidly acquiring dozens of skilled

---

[1] The court takes judicial notice of Defendant's Sunbiz filings.  The Federal Rules of Evidence allow a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  District courts in the Eleventh Circuit routinely take judicial notice of Sunbiz records because they are "publicly available on the Florida Department of State's website."  *McGlynn v. Mia. Diario LLC*, No. 22-cv-24261-SCOLA/GOODMAN, 2024 WL 1910670, at *3 n.3 (quoting *Am. Marine Tech, Inc. v. World Grp. Yachting, Inc.*, 418 F. Supp. 3d 1075, 1082 (S.D. Fla. 2019)), *report and recommendation adopted by* 2024 WL 1908971 (S.D. Fla. May 1, 2024).

nursing facilities throughout the state of Florida. (Hr'g Tr. 134.)[2] All told, Defendant spent roughly $1.2 billion to acquire its Florida facilities. (*Id.* 137.) Defendant states that it offers nursing home and post-acute care services under the trademark ASPIRE HEALTH GROUP and through its website, located at www.aspirehealthgrp.com. (Dkt. 28 at 6.) Stressing the similarity of the services the two organizations offer, Plaintiff alleges that, "[o]n information and belief," "[Defendant]'s facilities are obligated to provide various behavioral health services," and that "[Defendant] is licensed to provide, and does provide, both clinical and pharmaceutical services to its patients." (Dkt. 1-1 at 11.) Plaintiff also claims that Defendant's website "is strikingly similar" to Plaintiff's. (*Id.*) Plaintiff notes that both websites "begin with the identical ASPIRE[] mark," both feature the mark "in all caps and in a turquoise color scheme," and that both orient the marks such that ASPIRE is "the dominant element in size and prominence," with HEALTH GROUP and HEALTH PARTNERS "presented in a smaller size below the ASPIRE mark." (*Id.* at 12–13.) Accordingly, Plaintiff claims that "the respective websites present the same commercial impression to consumers" and that both "have the same overall look and feel." (*Id.* at 13.)

Plaintiff alleges that Defendant's use of a confusingly similar mark and website has resulted in several "documented . . . instances of actual confusion." (*Id.*) This includes: (1) several "misdirected e[]mail[s]" regarding employee issues, (*id.*; Dkt. 1-2 at 39–46), (2) at least one "misdirected phone call from the [OSHA] regarding the

---

[2] All citations to the Hearing Transcript are from an initial transcript provided by the court reporter.

failure to timely file a report," (Dkt. 1-1 at 13; Dkt. 1-2 at 51–52), (3) an email from someone claiming to have had a job interview with Plaintiff who reported that the interviewer failed to arrive on time, (Dkt. 1-2 at 48–49), and (4) an email apparently from one of Defendant's residents complaining about the quality of the food, (*id.* at 36–37). Plaintiff claims that continued confusion, given its "important healthcare mission," could produce "dire consequences." (Dkt. 1-1 at 14.) This claim is supported by the fact that Plaintiff's Associate Vice President of Development and Community Relations, Todd Dixon, reported that he continues to receive misdirected emails and phone calls "once or twice a week." (Hr'g Tr. 77, 99–100.)

The first documented incident of confusion Plaintiff reported was the email complaining about the quality of the food served at one of Defendant's facilities, which was sent on March 4, 2024. (Dkt. 1-2 at 36.) Plaintiff filed a motion for temporary injunction in the Ninth Judicial Circuit Court of Florida on July 30, 2024. *See Aspire Health Partners, Inc. v. Aspire MGT LLC*, No. 2024-CA-006784-O (Fla. Cir. Ct.), Dkt. 1. On the same day, Plaintiff filed a Verified Complaint, alleging trademark infringement under § 495.131, Florida Statute (Counts I–III), unfair competition under the common law (Count IV), and unfair competition and cybersquatting under the Lanham Act, 15 U.S.C. §§ 1051–1141 (Counts V–VI). (*See* Dkt. 1-1 at 2, 14–21.) Defendant removed the case to this court on August 29, 2024. (Dkt. 1.) Plaintiff moves to enjoin Defendant "from the acts of trademark infringement . . . and cybersquatting . . . referenced in the Verified Complaint" and, in support, filed the Declaration of Todd Dixon, Plaintiff's Associate Vice President of Development and

Community Relations. (Dkts. 16 & 17.) Defendant opposes the Motion and, in support, filed the Declaration of John Rossler, one of Defendant's attorneys. (Dkts. 28 & 30.)

## CONCLUSIONS OF LAW

A plaintiff is entitled to a preliminary injunction if they can establish "(1) substantial likelihood of success on the merits[,] (2) irreparable injury will be suffered unless the injunction issues[,] (3) the threatened injury to the movant outweighs whatever danger the proposed injunction may cause the opposing party[,] and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "A preliminary injunction is an extraordinary remedy that should only be entered upon the movant establishing each of the four requisite elements." *Hoop Culture, Inc. v. Gap, Inc.*, 122 F. Supp. 3d 1338, 1343 (M.D. Fla. 2015) (citing *Robertson*, 147 F.3d at 1306). Accordingly, "[f]ailure to establish even one of the elements is fatal to a motion for a preliminary injunction." *MC3 Invs. LLC v. Local Brand, Inc.*, 661 F. Supp. 3d 1145, 1158 (N.D. Fla. 2023) (citing *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1200 (11th Cir. 2001), and *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994)). "The grant or denial of a preliminary injunction is a decision within the discretion of the district court." *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997) (per curiam).

### A. Substantial Likelihood of Success on the Merits

Plaintiff seeks to enjoin Defendant from "the acts of trademark infringement" alleged under Florida law and cybersquatting under the Lanham Act. (Dkt. 16 at 1.) The court considers Plaintiff's likelihood of success on each claim in turn.

#### 1. Trademark Infringement

Florida Statute section 495.131, under which Plaintiff's trademark infringement claims proceed, generally proscribes the commercial use of another's registered mark in such a way as "is likely to cause confusion, to cause mistake, or to deceive." The test for trademark infringement under Florida law is the same as that under the Lanham Act, and thus, Plaintiff must demonstrate "(1) that its mark has priority, and (2) that [Defendant]'s mark is likely to cause consumer confusion." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.* ("*FIU I*"), 91 F. Supp. 3d 1265, 1274, 1288 (S.D. Fla. 2015); *see also* Fla. Stat. § 495.181 ("The intent of this chapter is to provide a system of trademark registration and protection substantially consistent with the federal system of trademark registration and protection under the Trademark Act of 1946, as amended."). Plaintiff's Florida trademark registrations constitute "prima facie evidence of the validity of the registration, [Plaintiff]'s ownership of the mark, and of [Plaintiff]'s exclusive right to use the mark in this state on or in connection with the goods or services specified in the certificate." Fla. Stat. § 495.061. Moreover, Defendant does not contend that Plaintiff lacks priority in its mark, (*see* Dkt. 28), but

rather that Plaintiff has not established that Defendant's use of the mark in commerce creates a likelihood of confusion, (*id.* at 9).  Accordingly, the court will proceed only under the likelihood of confusion analysis.  *See It's A 10, Inc. v. Beauty Elite Grp., Inc.*, 932 F. Supp. 2d 1325, 1331 (M.D. Fla. 2013) (proceeding only under likelihood-of-confusion analysis where "[the d]efendants d[id] not dispute [the p]laintiff's rights in its marks").

The question at the heart of the likelihood-of-confusion inquiry "is whether there is a likelihood that consumers will be confused about the relationship or affiliation between [the] plaintiff's products or services and the defendant's products or services."  *Popular Bank of Fla. v. Banco Popular de P.R.*, 9 F. Supp. 2d 1347, 1358 (S.D. Fla. 1998).  The analysis is broken into two steps.  *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 947 (11th Cir. 2023).  "At step one, the court considers several factors which can provide circumstantial evidence of likelihood of confusion."  *Id.*  The factors are:

> (1) the strength of the plaintiff's mark[,] (2) the similarity between the plaintiff's mark and the allegedly infringing mark[,] (3) the similarity between the products and services offered by the plaintiff and defendant[,] (4) the similarity of the sales methods[,] (5) the similarity of the advertising methods[,] (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark[,] and (7) actual confusion.

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1220 (11th Cir. 2008).  The Eleventh Circuit has further noted "that consumer sophistication may also be relevant to assessing likelihood of confusion."  *FCOA*, 57 F.4th at 957.

Then, "[a]t step two, the court weighs each of the relevant circumstantial facts—independently and then together—to determine whether the ultimate fact, likelihood of confusion, can reasonably be inferred." *Id.* at 947. "Because the bottom line is the likelihood of consumer confusion, application of the[se] . . . factors entail[] more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 649 (11th Cir. 2007). At the same time, "the two most important circumstantial facts are respectively actual confusion and the strength of the mark." *FCOA*, 57 F.4th at 947; *see Invisasox, LLC v. Everythng Legwear, LLC*, No. 8:18-cv-2639-T-17GW, 2020 WL 3128864, at *3 (M.D. Fla. June 12, 2020) ("[E]vidence of actual confusion is the most important factor, and the strength of the mark is the second most important factor.").

### a) Actual Confusion

"Actual confusion asks whether there is evidence in fact of confusion." *FCOA*, 57 F.4th at 956. While not a prerequisite for finding a likelihood of confusion, "[i]t is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion." *Frehling Enters., Inc.v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). "[T]he quantum of evidence needed to show actual confusion is relatively small," *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 139 (11th Cir. 2022) (quotation omitted), and so "even 'very little' evidence of actual confusion 'is highly probative,'" *MC3 Invs.*, 661 F. Supp. 3d at 1165–66 (quoting *Sovereign Mil. Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the*

*Sovereign Order of Saint John of Jerusalem, Knights of Malta, the Ecumenical Order* ("*Sovereign Mil.*"), 809 F.3d 1171, 1189 (11th Cir. 2015)); *see also PlayNation Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1167 (11th Cir. 2019) ("While numerous instances of actual confusion add greater weight in favor of confusion, the quantum of evidence needed to show actual confusion is relatively small." (quotation omitted)).

"In assessing the weight of evidence of actual confusion, [the court] must consider who was confused and how they were confused: 'Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, . . . while confusion of actual customers of a business is worthy of substantial weight." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.* ("*FIU II*"), 830 F.3d 1242, 1264 (11th Cir. 2016) (emphasis omitted) (quoting *Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982), *abrogated on other grounds by Tobinick v. Novella*, 884 F.3d 1110 (11th Cir. 2018)). That is, the weight afforded evidence of actual confusion "depends on the number of instances of confusion, the kinds of persons confused, and the degree of confusion." *Sovereign Mil.*, 809 F.3d at 1189 (quotation omitted); *see Safeway*, 675 F.2d at 1167 ("Perhaps as important as . . . the number of instances of confusion are the kinds of persons confused and degree of confusion.").

While courts speak of "consumer confusion," courts consider confusion on the part of the "consuming public" more broadly. *FCOA*, 57 F.4th at 947. Specifically, courts have also considered confusion among suppliers, distributors, and prospective employees. *Conagra, Inc. v. Singleton*, 743. F.2d 1508, 1515 n.10 (11th Cir. 1984); *see*

*id.* at 1515 (finding that the "proof of actual confusion . . . was such strong evidence of likely confusion that the district court could not have reasonably found otherwise" where the plaintiff "established that customers and people in the seafood trade actually confused the defendant's business with that of the plaintiff"). Accordingly, "[a]ctual confusion may be shown in a variety of ways, including 'inquiries regarding possible affiliations between the parties,' 'attempts to purchase goods or services actually offered by the party,' and 'misdirected correspondence such as bills or letters.'" *Eli Rsch., LLC v. Must Have Info Inc.*, No. 2:13-cv-695-FtM-38CM, 2015 WL 5934611, at *7 (M.D. Fla. Oct. 6, 2015) (quoting *Homes & Land Affiliates, LLC v. Homes & Loans Mag., LLC*, 598 F. Supp. 2d 1248, 1264 (M.D. Fla. 2009)).

In its briefing and at the evidentiary hearing, Plaintiff presented evidence of misdirected emails and a misdirected phone call (that is, communications allegedly intended for Defendant but that Plaintiff received) as evidence of actual confusion. (Dkt. 17 at 4–7; Hr'g Tr. 63–65.) One of the emails appears to have been sent by one of Defendant's residents of "about 2 years," who wrote to complain about the quality of the food served at the facility. (Dkt. 17-5 at 1–2 ("Lately the food here is dis[g]usting. The food is either undercooked or just terrible . . . [and is] almost always cold.").) In the same vein, Jeremy Maxwell, Plaintiff's Vice President of Risk Management, described a phone call he received from "a woman who wanted to make a complaint regarding the death of her spouse." (Dkt. 48-16; Hr'g Tr. 59, 63–65.)[3]

---

[3] Defendant has not objected to the court's consideration of this evidence as hearsay or on any other grounds. (*See* Dkt. 28; Hr'g Tr.) Moreover, "[a]t the preliminary injunction stage, a district court may

The caller, according to Maxwell, indicated that her husband had died of sepsis while in Defendant's care and explained that she found Plaintiff's phone number after conducting a Google search for Defendant. (Dkt. 48-16 at 1.) Accordingly, for purposes of its Motion, Plaintiff has demonstrated two instances of actual confusion on the part of consumers, the group "whose confusion is most significant." *Safeway*, 675 F.2d at 1167; *see Tortoise Island Homeowners Assoc., Inc. v. Tortoise Island Realty, Inc.*, 790 So. 2d 525, 534 (Fla. Dist. Ct. App. 2001) ("Proof of some actual confusion (and it need not be much), is sufficient to establish likelihood of confusion. As noted above, there was evidence in this case that both entities received mail and telephone calls intended for the other."). This finding is supported by the fact that the latter individual was directed to Plaintiff after searching for Defendant on the internet. *See Nakava, LLC v. S. Pac. Elixir Co.*, No. 19-81128-CV-SINGHAL/MATTHEWMAN, 2022 WL 3025306, at *9 (S.D. Fla. July 31, 2022) (finding actual confusion where, among other things, the defendant explained that its and plaintiff's "companies [we]re entangled on the internet such that a search on Google for one yield[ed]" results regarding the others).

Upon review of other emails Plaintiff provided, three emails appear to have come from Defendant's own employees; one was sent to complain about understaffing, (Dkt. 17-8), while the other two were regarding administrative requests,

---

rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

(Dkts. 17-6 & 17-7). This confusion, though not "consumer confusion," is not insignificant. *See Corbitt Mfg. Co. v. GSO Am., Inc.*, 197 F. Supp. 2d 1368, 1376 (S.D. Ga. 2002) ("While the confusion of [the defendant]'s employees deserve less weight [than evidence of consumer confusion], it also points to actual confusion."); *Oviedo Med. Ctr., LLC v. Adventis Health Sys./Sunbelt, Inc.*, No. 6:19-cv-1711-Orl-78EJK, 2020 WL 4218276, at *2 (M.D. Fla. Apr. 28, 2020) (determining that "instances of . . . confusion by patients, vendors, emergency services personnel, and . . . [the d]efendant's employees" constituted actual confusion). Another email was from an individual who appears to have been seeking employment with Defendant, and who wrote to complain that the interviewer failed to appear and suggested that his or her observations of Defendant's facility had "made [him or her] a bit leery of trying any further to seek employment" with Defendant. (Dkt. 17-10.) This, too, constitutes evidence of actual confusion. *See Conagra*, 743 F.2d at 1515 n.10 (considering as evidence of actual confusion that "[p]rospective employees had contacted [Defendant] in response to 'help wanted' ads placed by [Plaintiff]"). The same is true of the email from Brenno Carillo, "a reporter with the Daytona Beach News-Journal," who contacted Plaintiff for a statement in advance of a planned protest of one of Defendant's facilities. (Dkt. 17-12); *see SunAmerica Corp. v. Sun Life Assur. Co. of Can.*, 890 F. Supp. 1559, 1576 (N.D. Ga. 1994) ("Confusion exists . . . when newspapers confuse the names of the parties in reporting financial events[.]"); *cf. Tipsey McStumbles, LLC v. Griffin*, No. CV 111-053, 2011 WL 13216946, at *5 (S.D. Ga. May 12, 2011) ("Lastly, there is evidence of actual confusion in the marketplace. Local newspaper

articles have characterized the [p]laintiff and [the d]efendant's pubs as operating in association with one another.").

Plaintiff also received an email seeking to garnish one of Defendant's employee's wages, (Dkt. 17-9), and a phone call from the United States Department of Labor that indicated that Defendant was "out of compliance with OSHA reports," (Dkt. 18-1 at 3). The email from the erstwhile wage garnisher might be classified as the sort of "[s]hort-lived confusion or confusion of individuals only casually acquainted with a business" that is "worthy of little weight." *Safeway*, 675 F.2d at 1167; *but see Tortoise Island Homeowners Assoc.*, 790 So. 2d at 534. However, the phone call from the Department of Labor carries greater weight. *See JPMorgan Chase & Co. v. Chase Fin. Grp.*, No. 1:06-cv-2159, 2007 WL 9702856, at *2 (N.D. Ga. May 14, 2007) (considering confusion among "government agencies" in finding actual confusion). This is because a government agency is not likely to be only casually acquainted with the businesses it is created to monitor, especially where, as Plaintiff reports, penalties might attach for failure to comply with reporting requirements. (*See* Dkt. 18-1 at 3.)

Ultimately, given the evidence of actual confusion adduced by Plaintiff, the court is persuaded that it has demonstrated actual confusion, and that this most important factor weighs in its favor. *See Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 937 (11th Cir. 2010) ("[T]he quantum of evidence needed to show actual confusion is relatively small."). This conclusion is supported by Todd Dixon's deposition testimony that he continues to receive misdirected emails and phone calls weekly. (Hr'g Tr. 99–100); *see Breakers of Palm Beach, Inc. v. Int'l Beach*

*Hotel Dev., Inc.*, 824 F. Supp. 1576, 1586 (S.D. Fla. 1993) ("[T]he incidents of confusion, taken together, point overwhelmingly to a likelihood of confusion. The incidents described are not isolated, unrelated events. Rather, they represent an ongoing pattern which has occurred in the past and is likely to continue.").

### b) Strength of the Marks

"Strength or 'distinctiveness' describes a mark's ability to allow consumers to identify the source of a good or service." *Id.* The overall strength of a mark depends upon both its conceptual strength and commercial strength. *Id.* "Conceptual strength describes the *potential* of a mark to aid consumer recognition, which [is] evaluate[d] through an abstract linguistic analysis." *Id.* at 949; *see also Frehling*, 192 F.3d at 1335 (noting that the conceptual strength of a mark is essentially a measure of the "relationship between the name and the service or good it describes"). "Courts determine this potential by placing a mark on the sliding scale of trademark strength, from weakest to strongest: (1) generic, (2) descriptive, (3) suggestive, and (4) fanciful or arbitrary." *FCOA*, 57 F.4th at 949.

> Generic marks are the weakest and not entitled to protection—they refer to a class of which an individual service is a member (e.g., "liquor store" used in connection with the sale of liquor). Descriptive marks describe a characteristic or quality of an article or service (e.g., "vision center" denoting a place where glasses are sold). Suggestive terms suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive. For instance, "penguin" would be suggestive of refrigerators. An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services).

- 14 -

*Frehling*, 192 F.3d at 1335. "Commercial strength," on the other hand, "refers to the real-world consumer recognition of a mark, most often created by the efforts and work of the mark holder." *FCOA*, 57 F.4th at 950. "Commonly used evidence of commercial strength includes third[-]party use[,] advertising and promotion[,] sales and number and types of customers[,] recognition by trade, media, and customers[,] and survey of likely customers." *Id.* In *FCOA*, for example, the court relied upon evidence of the plaintiff's "$7[ million]-a-year advertising budget" as well as "evidence about the size and scope of its agent class, its over $2.4 billion in annual insurance premiums, its recognition in independent publications, an AARP endorsement, and a survey showing that a majority of South Florida respondents had heard of [the plaintiff]." *Id.* at 952.

Turning now to Plaintiff's Aspire trademarks, the court finds that they are laudatorily descriptive, and thus relatively weak. "A descriptive mark identifies a characteristic or quality of a product or service, such as its . . . desirable features." *Popular Bank*, 9 F. Supp. at 1356. These include laudatory terms, which claim to be "descriptive of the alleged merit of a product." *DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1256 (11th Cir. 2012). "Self-laudatory or puffing marks are regarded as a condensed form of describing the character or quality of the goods." *Id.* The Aspire trademarks operate primarily in this vein, connecting the medical services offered by Plaintiff with the word "aspire," which, in this context, most likely means "to seek to attain or accomplish a particular goal," and "[to] ascend, [to] soar."

*Aspire*,       UNABRIDGED.MERRIAM-WEBSTER.COM,       https://unabridged.merriam-webster.com/collegiate/aspire (last visited Oct. 21, 2024).  Or, as Defendant suggests, Plaintiff is "aspiring to be the best."  (Dkt. 28 at 10.)

Plaintiff offers no contrary definition, but instead asserts that the "Aspire Trademarks are considered arbitrary because they bear no relationship to the healthcare services being offered (i.e., the word 'Aspire' has nothing to do with medical services)."  (Dkt. 16 at 10.)  The court disagrees—the Aspire trademarks would appear to fit the definition of laudatory marks.  *See Uber Promotions, Inc. v. Uber Techs., Inc.*, 162 F. Supp. 3d 1253, 1267 (N.D. Fla. 2016) ("[The self-laudatory mark] principle is simply the idea that, generally speaking, a term such as 'best' or 'super' that 'extol[s] some feature or attribute of . . . goods or services' is descriptive in nature and likely to be too weak to be trademarked." (quoting 2 McCarthy on Trademarks and Unfair Competition § 11:17, Westlaw (4th ed., database updated Dec. 2015)).  For example, the terms "pinnacle," "foremost," and "popular" have been found to be laudatorily descriptive.  *See Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, No. 18-CV-81606-MIDDLEBROOKS, 2019 WL 7838303, at *2 (S.D. Fla. Oct. 2, 2019) ("[T]he term 'Pinnacle' appears to be a merely laudatory term describing the quality of advertising and marketing services provided by the Parties."); *FCOA*, 57 F.4th at 951 ("Here, 'Foremost' is a descriptive mark, a self-laudatory term meaning the best."); *Popular Bank*, 9 F. Supp. at 1357 ("[T]he [c]ourt finds that the trademark Popular Bank of Florida consists of the laudatory word 'Popular' joined with the

commercially descriptive word 'Bank' and the geographically descriptive term 'of Florida.' Thus, taken as a whole, 'Popular Bank of Florida' is a descriptive mark.").

That Plaintiff's trademarks are merely descriptive is not fatal because a descriptive mark, "though not inherently distinctive, can acquire distinctiveness or 'secondary meaning' by becoming associated with the proprietor's product or service." *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007); *see Popular Bank*, 9 F. Supp. at 1357 ("Thus, taken as a whole, 'Popular Bank of Florida' is a descriptive mark. It is entitled to protection only if the plaintiff shows that the mark has acquired secondary meaning."). This is, however, a high bar. "In order to establish secondary meaning the plaintiff must show that the primary significance of the term in the minds of the consumer public is not the product but the producer." *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987) (quoting *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 118 (5th Cir. 1979)). "Establishing secondary meaning is best accomplished by surveys or other quantitative evidence." *Lanard Toys Ltd. v. Toys "R" Us-Del., Inc.*, No. 3:15-cv-849-J-34PDB, 2019 WL 1304290, at *24 (M.D. Fla. Mar. 21, 2019) (quoting *Olem Shoe Corp. v. Wash. Shoe Corp.*, No. 09-23494-CIV, 2011 WL 6202282, at *20 (S.D. Fla. Dec. 1, 2011)).

> Absent consumer survey evidence, four factors can be considered in determining whether a particular mark has acquired a secondary meaning: (1) the length and manner of its use, (2) the nature and extent of advertising and promotion, (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's business, and (4) the extent to which the public actually identifies the name with the plaintiff's service.

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1525 (11th Cir. 1991) (quoting *Conagra*, 743 F.2d at 1513).

Here, Plaintiff has shown through its trademark registrations that it has been using the Aspire trademarks for more than eleven years. (*See* Dkt. 16 at 4.) As Todd Dixon stated in his declaration, Plaintiff advertises its marks on its website, through social media, via the "outdoor signage of its facilities" and "on indoor signage, at tradeshow kiosks, and in promotional flyers," and, finally, with "various promotional items, such as pens, t-shirts, sunglasses, and business cards." (Dkt. 17 ¶¶ 10–13.) At the hearing, Dixon estimated that Plaintiff has spent several million dollars in advertising. (Hr'g Tr. 83.) However, "the question is not the extent of the promotional efforts, but their effectiveness in altering the meaning of [the word] to the consuming public," and Plaintiff provides no evidence on this front. *FN Herstal SA v. Clyde Armory, Inc.*, 838 F.3d 1071, 1085 (11th Cir. 2016).

In support of its contention that it has developed secondary meaning in its marks, Plaintiff cites to the News Coverage Overview attached to Todd Dixon's declaration, highlighting 113 instances of Aspire receiving some form of media coverage. (Dkt. 17-1.) The court notes first that a number of these articles appear unrelated, or only tangentially related, to Plaintiff's services. (*See, e.g.*, *id.* at 1 ("Central Florida's 2024 Women Who Mean Business winners announced"); *id.* at 4 ("Orlando company goes green with fresh, custom salads straight from vending machines"); *id.* at 5 ("PEARLS OF WISDOM: How OBJ's 2021 Women Who Mean Business

- 18 -

overcame obstacles and came out shining"); *id.* ("Introducing OBJ's 2021 Women Who Mean Business honorees"); *id.* ("Osceola Sheriff's Office OCIB Charitable Contributions"); *id.* at 6 ("Not just lip service: Here's how local biz leaders are talking about race with employees, clients[,] and others"); *id.* ("Local execs: How tough conversations on racial inequality should be handled in the workplace")*; id.* at 7 (referencing an article regarding "People on the move").)  Moreover, "evidence of unsolicited media attention . . . is insufficient when that information is not accompanied by evidence of circulation . . . which would enable the court to determine whether these stories reached enough consumers to create secondary meaning throughout the state." *Pronman v. Styles*, No. 12-80674-CIV, 2015 WL 58629, at *9 (S.D. Fla. Jan. 5, 2015) (internal quotation marks omitted) (quoting *MJM Prods. V. Kelley Prods., Inc.*, No. Civ.03-390-JD, 2003 WL 22205129, at *8 (D.N.H. Sept. 24, 2003)).

Further still, Defendant points to evidence of third-party use of the ASPIRE mark.  The Eleventh Circuit has noted that third-party use of a mark can "significantly diminish the public's perception that the mark identifies items connected with the owner of the mark." *FCOA*, 57 F.4th at 950.  In its response, Defendant notes three other entities employing the ASPIRE mark "in the Florida healthcare industry": ASPIRE DIRECT PRIMARY CARE, ASPIRE HEALTH SCIENCE, and ASPIRE HEALTH PHARMACY SERVICES.  (Dkt. 28 at 11.)  According to the Florida Department of State's records, it appears that ASPIRE HEALTH SCIENCE has been rendered inactive for failure to file its most recent annual report, though the others are

both listed as being active.[4]  Even if "this does not amount to extensive third-party usage, it does weigh slightly in favor of [D]efendant." *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1182 (11th Cir. 1985).

Ultimately, the court does not find that Plaintiff has met its "heavy burden of proof" in demonstrating that it "has achieved the recognition for its name that it has sought," *Gulf Coast*, 2006 WL 1382072, at *10, especially given its "fail[ure] to produce survey or other quantitative evidence," which "renders Plaintiff's uphill battle even steeper," *Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, No. 10-61532-CIV, 2011 WL 4005454, at *7 (S.D. Fla. Sept. 8, 2011).  Thus, the court concludes that the marks at issue are merely descriptive without secondary meaning, and thus, this factor weighs in Defendant's favor.

### c) Similarity of the Marks

To determine the degree of similarity between the Aspire trademarks and Defendant's purportedly infringing mark, the court is required to "compare[] the marks and consider[] the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling*, 192 F.3d at 1337. "Of course, the marks don't need to be identical to support a finding of similarity, because the key is to determine if the similarities are sufficient to deceive the public. *FCOA*, 57 F.4th at 952.  "Because of its malleability, [the Eleventh Circuit] ha[s]

---

[4] The court takes judicial notice of these entities' Sunbiz filings.  (*See supra* n.1.)

described this analysis as a 'subjective eyeball test.'" *Id.* (quoting *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1540 (11th Cir. 1986)).

Here, there is no question that the marks are similar—as used, the most prominent feature is the mark itself, ASPIRE, and the presentation of the mark in the parties' logos, prominently displayed on their websites and in their marketing materials, are also similar. (*See* Dkt. 1-1 at 12 (comparing the landing pages of the parties' websites); Dkt. 16 at 11 (comparing the parties' logos); Dkts. 17-3 & 17-4 (collecting examples of Plaintiff's use of the mark in its promotional materials).) And while the parties use different fonts, both employ a blue color scheme.



Indeed, minor differences like "fonts and colors" are "less important because consumers are unlikely to confront [the logos] side-by-side in the real-world where they could be discerning about those differences." *FCOA*, 57 F.4th at 953. The court in *FCOA*, for example, found the following logos sufficiently similar to weigh in favor of a likelihood of confusion under this factor:



The court determines that this factor weighs in favor of Plaintiff.

### d)  Similarity of the Services

Plaintiff's and Defendant's services are both related to the provision of healthcare.  As Defendant notes, it offers nursing home and post-acute care services while Plaintiff offers services related to mental health and substance abuse, health assessments and screenings, "and the delivery and coordination of primary medical care services," among other things.  (Dkt. 28 at 14.)  As the Eleventh Circuit has noted, this factor concerns "whether the products are of a kind the public could *think* originate from a single source."  *FCOA*, 57 F.4th at 953.  It need only be shown that the parties' products or services are "related in some manner" or that "the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that [the goods or services] emanate from the same source."  *Wreal*, 38 F.4th at 132 (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369 (Fed. Cir. 2012)).  Accordingly, the *FCOA* court found that the insurance products the competing parties offered were similar, even though they were, at a technical level, distinct, because "consumers [we]re unlikely to know that and, even if they did, could potentially assume that [the defendant] was a subsidiary or affiliate of [the plaintiff]." *Id.*  The Eleventh Circuit has elsewhere determined that wine was sufficiently similar to cognac or brandy to support a finding of a "high degree of similarity."  *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985).

The court finds that the parties' services are similar.  Although Defendant draws technical distinctions between the range of services it and Plaintiff offers, noting that

it "is in the business of offering nursing home and post-acute care services," whereas Plaintiff offers other forms of healthcare, (*see* Dkt. 28 at 6), the court determines that the public could well think that these services emanate from the same source. The court reiterates that "the focus is on the reasonable belief of the average consumer as to what the likely source of the goods [i]s." *Wreal*, 38 F.4th at 133 (internal quotation marks and citation omitted). As in *Wreal*, the court finds that reasonable consumers could conclude that Plaintiff, in addition to its broader range of medical services, had come to offer the medical services provided by Defendant. *Id.* at 133 (finding that a reasonable consumer could conclude that the defendant, Amazon, had decided to offer the plaintiff's product, "a standalone set-top box dedicated to streaming hardcore pornography"); *see Frehling*, 192 F.3d at 1338 (finding that two furniture makers offered similar products, though one offered furniture made of metal, while the other offered furniture made of wood). Moreover, "the more similar the marks are, the less necessary it is that the products themselves be very similar to create confusion." *Wreal*, 38 F.4th at 134 (quoting *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006)). Thus, especially because the court has already determined that the marks are very similar, the court finds that this factor, too, weighs in Plaintiff's favor.

### e) Similarity of the Sales and Advertising Methods

With regard to the similarity of the sales methods, or "trade channels," the "primary focus . . . is on the overlap of the customer bases, because the greater the overlap, the greater the likelihood that consumers will be exposed to both marks and

become confused." *FCOA*, 57 F.4th at 954. The analysis as to whether the parties' advertising methods are similar is also straightforward: "[i]f a plaintiff and a defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *Turner Greenberg Assocs., Inc. v. C & C Imports, Inc.*, 320 F. Supp. 2d 1317, 1332 (S.D. Fla. 2004) (citing *AmBrit*, 812 F.2d at 1542). Here, both parties operate within the healthcare sphere and, as Plaintiff notes, "both parties advertise the marks on their respective websites, on various social media accounts, and on indoor and outdoor signage." (Dkt. 16 at 14.) Moreover, Defendant fails to offer any argument as to these factors, effectively conceding the point. (*See* Dkt. 28 at 14–15); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."), *overruled in part on other grounds by United States v. Durham*, 795 F.3d 1329, 1331 (11th Cir. 2015) (en banc); *Baptist Hosp. of Mia., Inc. v. Medica Healthcare Plans, Inc.*, No. 18-cv-25460-UU, 2019 WL 1915386, at *1 n.1 (S.D. Fla. Mar. 21, 2019) ("Plaintiff does not address the other elements, and so the [c]ourt considers any arguments as to them waived."). Thus, these factors weigh in Plaintiff's favor.

### f) Defendant's Intent

Under this factor, the court considers whether "defendant adopted [the] plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation." *Frehling*, 192 F.3d at 1340. Plaintiff argues that Defendant's intent can be inferred "given AML's adoption of the identical trademark on a website that is

- 24 -

strikingly similar to Aspire's website." (Dkt. 16 at 14.)  Plaintiff does not, however,

cite any support for this proposition.  (*See id.*)  The Eleventh Circuit has noted that,

"[i]f it can be shown that a defendant adopted a plaintiff's mark with the intention of

deriving a benefit from the plaintiff's business reputation, this fact alone may be

enough to justify the inference that there is confusing similarity."  *Frehling*, 192 F.3d

at 1340.  However, Plaintiff effectively concedes that, at this early stage in litigation, it

cannot speak to Defendant's intent.  (*See* Dkt. 16 at 14 ("Direct evidence of AML's

subjective intent would, of course, be difficult to obtain.").)  This factor, therefore,

does not favor a finding of a likelihood of confusion.  *See FIU I*, 91 F. Supp. 3d at 1282

("[T]he [c]ourt cannot adopt [the plaintiff]'s conclusory assertion that the undisputed

evidence demonstrates [the] defendant's improper intent to capitalize on [the

plaintiff]'s name and reputation.  Therefore, this factor does not favor a finding of a

likelihood of confusion.").

### g) Consumer Sophistication

Courts also look to the sophistication of the consumers in assessing likelihood

of confusion.  *See FCOA*, 57 F.4th at 957 ("[W]e have recognized that consumer

sophistication may also be relevant to assessing likelihood of confusion.").  This is

because "sophisticated consumers [of complex goods or services] . . . are less likely to

be confused than casual purchasers of small items."  *FIU II*, 830 F.3d at 1256

(alterations in original) (quoting *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1361

(11th Cir. 2007)); *see Freedom Sav. & Loan*, 757 F.2d at 1185 ("The sophistication of a

buyer certainly bears on the possibility that he or she will become confused by similar marks."). The court in *FIU II*, for example, reasoned that, because a college education presents an "important" and "expensive purchase," "[t]he degree of care and thought involved in choosing a college is undoubtedly higher than that required for most purchases." 830 F.3d at 1256 (quoting *Savannah Coll. of Art & Design, Inc. v. Houeix*, 369 F. Supp. 2d 929, 956 (S.D. Ohio 2004)). However, where the businesses in which the parties operate generally involve minimal participation on the part of the actual consumers, this factor will not favor a finding of likelihood of confusion. *See FCOA*, 57 F.4th at 957–58 ("However, . . . consumers generally have minimal involvement in the selection of a title insurance provider and rely entirely on the recommendations of their agents or professionals. . . . This makes sense; title insurance is a complex legal matter that, for the consumer, only involves a single, relatively small payment. Thus, home buyers and sellers are likely to be unsophisticated when buying title insurance." (quotation omitted)).

Here, while the parties provide medical services, it is not clear to what extent the ultimate consumers of the product are involved in the selection of the services. Defendant's Chief Operating Officer, Amitai Dagan, testified that Defendant receives most of its customers as referrals from hospitals. (Hr'g Tr. 119, 121.) Indeed, he emphasized that, for this reason, Defendant primarily gears its marketing toward referral sources rather than individual consumers. (Hr'g Tr. 126.) While it is true, as Defendant noted in its brief, that "even ordinary consumers tend to exercise some sophistication when it comes to decisions relating to healthcare," (Dkt. 28 at 13–14

(quoting *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F. Supp. 2d 1154, 1184
(D. Colo. 2012))), the issue is that Defendant's patients evidently are exercising little
to no independent discretion.  Accordingly, the only other case Defendant cited on
this point, which discussed the care a hospital employed in purchasing its own
implements, is inapposite.  (Dkt. 28 at 14 (quoting *United Country Real Est., LLC v.
United Realty Grp., Inc.*, No. 16-cv-60154-BLOOM/Valle, 2017 WL 4324634, at *17
(S.D. Fla. Sept. 29, 2017)).)

While it is not clear whether Plaintiff's business also operates primarily based
on referrals, it stands to reason that those suffering from substance abuse or mental
health disorders, like many of Plaintiff's patients, may temporarily lack the
sophistication contemplated under this factor, especially when seeking treatment.
(Hr'g Tr. 113.)  In its Motion, Plaintiff noted that its "patients are individuals that may
be in distress, suffering from mental health challenges, and possibly addiction," and
thus, are not likely to "take time or have the capacity to carefully review respective
advertising materials."  (Dkt. 16 at 12–13.)  For both of these reasons, the court finds
that this factor weighs in favor of a likelihood of confusion.  *See FCOA*, 57 F.4th at
957–58 (determining that, because they were largely uninvolved in the selection of title
insurance, "title insurance purchasers are unsophisticated and thus may be confused
by similar marks").

### h)  Balancing the Factors

To briefly summarize the court's findings under the foregoing factors, six weigh
in favor of a finding of a likelihood of confusion: actual confusion, the similarity of the

marks, services, advertisements, sales methods, and the lack of consumer sophistication.  Two weigh against a finding of a likelihood of confusion: the strength of the mark and the lack of evidence of bad-faith intent.

"Because the bottom line is the likelihood of consumer confusion, application of the *Frehling* factors entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'" *Custom Mfg.*, 508 F.3d at 649.  While the strength of the mark, the second most important factor, weighs in Defendant's favor, there is extensive evidence of actual, ongoing confusion, the *most* important factor.  *See FCOA*, 57 F.4th at 956.  "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."  *Custom Mfg.*, 508 F.3d at 650 (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)).  Accordingly, because Plaintiff has produced evidence that consumers—and many others—are *actually* confused, the court finds that Plaintiff has satisfied its burden of demonstrating a substantial likelihood of success on the merits.  *See Frehling*, 192 F.3d at 1340 ("It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion.").  This result is supported by the court's findings as to the remaining factors, all but one of which weighs in Plaintiff's favor.

## 2.  Cybersquatting

In passing the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d), Congress sought to proscribe "the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill

associated with such marks." *Boigris v. EWP P&T, LLC*, 7 F.4th 1079, 1084 (11th Cir. 2021) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 495 (2d Cir. 2000)).  To prevail, a plaintiff "must prove (1) that its trademark was distinctive when the defendant registered the challenged domain name[,] (2) that the domain name is identical or confusingly similar to the plaintiff's trademark[,] and (3) that the defendant registered the domain name with a bad-faith intent to profit." *Id.*  Courts in this Circuit have applied the following factors in reaching a determination as to whether a party had a bad faith intent in this context: (1) "[w]hether the defendant has a 'trademark or other intellectual property rights' in the domain name," (2) "[w]hether the domain name refers to the legal name of the defendant," (3) "[w]hether the defendant ever used the domain name 'in connection with the bona fide offering of any goods or services," (4) "[w]hether the defendant has a 'bona fide noncommercial or fair use of the mark in a site accessible under the domain name," (5) "[w]hether the defendant has an 'intent to divert consumers' from the mark owner's website to his own, either for commercial gain 'or with the intent to tarnish or disparage the mark,' when that diversion could case harm to the mark owner's goodwill," (6) "[w]hether the defendant offers to transfer or sell the domain name for financial gain when he has not used or had an intent to use the domain name in connection with 'the bona fide offering of any goods or services," (7) "[w]hether the defendant provide[d] 'material and misleading false contact information when applying for the registration of the domain name' or the defendant 'intentional[ly] fail[ed] to maintain accurate contact information," (8) "[w]hether the defendant acquired multiple domain names that the

defendant knows are identical or confusingly similar to distinctive marks," and (9) "[w]hether the mark is distinctive or famous." *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 776 (11th Cir. 2015) (citing 15 U.S.C. § 1125(d)(1)(B)(i)).  These "factors are permissive considerations," and thus the "court's analysis of whether a defendant had the bad faith intent to profit necessary to a cybersquatting claim is not based on a score card of the[se] statutory factors." *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1249 (11th Cir. 2009).

Because the court has already determined that the Aspire trademarks are weak—they are laudatorily descriptive—this weighs against a finding that Plaintiff enjoys a substantial likelihood of success on the merits.  *See Royal Palm*, 2010 WL 1524720, at *7 (determining that, because the court had already determined that the mark at issue was not distinctive, "Plaintiff ha[d] failed to show a substantial likelihood of success" on its cybersquatting claim).  The court finds further that many of the bad-faith factors also weigh against Plaintiff.  Defendant has used the domain name in connection with the bona fide offering of its services, has not been shown to possess any intent to divert consumers from Plaintiff's website to its own or to transfer or sell the domain name for financial gain, has not been shown to have provided misleading contact information in registering the domain name, or to have acquired multiple domain names identical or confusingly similar to Plaintiff's.  Indeed, as has already been noted, Plaintiff effectively concedes that there is no evidence that Defendant is operating in bad faith.  (*See* Dkt. 16 at 14.)

In its Motion, Plaintiff asserts only that Defendant's "domain name . . . is very close to [Plaintiff]'s," that consumers "are undoubtedly being misdirected to [Defendant]'s website," and that "[t]his constitutes a bad faith intent to profit from the Aspire [t]rademarks." (Dkt. 16 at 12.) And Plaintiff's verified complaint provides a merely conclusory allegation that Defendant acted in bad faith. (Dkt. 1-1 ¶ 91 ("[Defendant] registered the aspirehealthgrp.com domain with a bad faith intent to profit from it.").) Absent more, Plaintiff has failed to establish a likelihood of success on the merits of its cybersquatting claim. *New Century Mortg. Corp. v. 123 Home Loans, Inc.*, No. 05–80549 Civ., 2006 WL 3665985, at *7 (S.D. Fla. Nov. 17, 2006) (dismissing Plaintiff's cybersquatting claim where "there [wa]s no evidence that the defendant registered or used the domain name www.123homeloans.com with a specific bad faith intent to profit").

Because Plaintiff has failed to demonstrate a substantial likelihood of success on the merits with regard to its cybersquatting claim, the court must deny its Motion as to that claim. *See Royal Palm*, 2010 WL 1524720, at *7 ("Because Plaintiff has failed to show a substantial likelihood of success on the merits of its claims, the [c]ourt need not discuss the remaining elements of a preliminary injunction."). However, the court proceeds under the remaining elements as to Plaintiff's claims of trademark infringement.

### B. Irreparable Injury

In addition to a substantial likelihood of success on the merits, a party seeking a preliminary injunction must demonstrate that absent the injunction, they would be

subject to irreparable injury. *McDonald's*, 147 F.3d at 1306. In the past, a party seeking a preliminary injunction in a trademark infringement case was entitled to a presumption of irreparable harm upon a showing of a substantial likelihood of success on the merits. *See N. Am. Med.*, 522 F.3d at 1227; *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989) ("It is generally recognized in trademark infringement cases that (1) there is not [an] adequate remedy at law to redress infringement and (2) infringement by its nature causes irreparable harm." (quotation omitted)). However, the Supreme Court has since determined that courts may not adopt categorical rules with regard to granting injunctive relief—at least in the context of claims of patent infringement. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006). This clarification in the applicable law followed from the plain language of the text of the Patent Act, which states that "injunctive relief 'may' issue only 'in accordance with the principles of equity.'" *Id.* (quoting 35 U.S.C. § 283).

The Eleventh Circuit has not addressed the effect of *eBay* on the presumption that previously attached in trademark infringement cases, although it has noted that the Lanham Act employs language similar to the Patent Act. *See N. Am. Med.*, 522 F.3d at 1228 ("Similar to the Patent Act, the Lanham Act grants federal courts the 'power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable.'" (quoting 15 U.S.C. § 1116(a))). However, courts in this circuit have emphasized that, per se presumptions aside, the harm inflicted by trademark infringement, generally speaking, has no adequate remedy at law and is therefore irreparable such that an injunction is appropriate. Accordingly,

> while it was perhaps inappropriate in the past to *presume*
> irreparable harm, that practice was grounded upon the
> sound principle that the harm associated with trademark
> infringement is *typically* irreparable in nature.  So while a
> court must, in each trademark infringement case, make a
> finding of irreparable harm before an injunction may issue,
> that finding will often be made due to the nature of the
> harm.

*Uber Promotions*, 162 F. Supp. 3d at 1262.

Plaintiff has presented significant evidence of actual—and ongoing—confusion among the consuming public, and the Eleventh Circuit "recognizes such confusion as an injury that ordinarily warrants injunctive relief." *Boulan S. Beach Master Ass'n, Inc. v. Think Props., LLC*, 617 F. App'x 931, 934 (11th Cir. 2015).  Such confusion constitutes a harm to the victim in a trademark-infringement suit in part because it imperils their reputation and goodwill.  *See Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190–91 (11th Cir. 2005) ("The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods.  Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another.").  Moreover, on the record before the court, it appears that Defendant's business is subject to criticism in the press, (*see* Dkts. 17-12 & 17-13), and even government penalty, (*see* Dkt. 17-11).  Accordingly, this would not seem to be the rare case in which alleged trademark infringement did not produce an irreparable harm.  *Compare Hoop Culture*, 648 F. App'x at 985–86 (affirming the district court's finding of no irreparable harm where the defendant had already sold out of all allegedly

infringing merchandise and "had no future plans to sell" more), *with Think Props.*, 617 F. App'x at 934 ("The [plaintiffs] alleged in their amended complaint and argued in support of their motion that [the defendant]'s use of the [plaintiffs'] marks causes confusion and damage to their brand. Our precedent recognizes such confusion as an injury that ordinarily warrants injunctive relief.").

However, because Plaintiff delayed in seeking an injunction, the court's analysis must proceed. "A preliminary injunction requires showing 'imminent' irreparable harm," and so "[a] delay in seeking a preliminary injunction of . . . only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). "[T]wo time periods are relevant in determining whether a plaintiff acts promptly in seeking judicial relief: (1) a plaintiff cannot delay in filing a complaint after discovering a potential infringer, and (2) a plaintiff must move quickly in filing a motion for a preliminary injunction once a complaint has been filed." *Menudo Int'l, LLC v. In Mia. Prod., LLC*, No. 17-21559-Civ-TORRES, 2017 WL 4919222, at *5 (S.D. Fla. Oct. 31, 2017). "If *either* is unreasonably delayed, a finding of irreparable harm is significantly weakened." *Id.*

Plaintiff was aware of the existence of the alleged confusion at least as early as March 4, 2024, but did not seek an injunction until July 30, 2024, nearly five months later. (*See* Dkt. 17-5 at 2–3); *Aspire Health Partners*, No. 2024-CA-006784-O, Dkt. 1. This militates against a finding of irreparable harm—indeed, the Eleventh Circuit in *Wreal* discerned no abuse of discretion where a "district court concluded that [the

plaintiff]'s unexplained five-month delay in seeking a preliminary injunction, by itself, fatally undermined any showing of irreparable injury." 840 F.3d at 1248.

Plaintiff's delay is not unexplained, however. At the hearing, Dixon testified that, although the confusion Plaintiff reported began with a few relatively innocent misdirected calls and emails, these "ramp[ed] up in . . . frequency and seriousness" between March and June 2024. (Hr'g Tr. 100.) This period culminated in the phone call from the Department of Labor, at which point Plaintiff understood the gravity of the confusion at issue. (*Id.*; *see also* Dkt. 17-11 at 3.) This phone call was reported to Plaintiff's management on June 24, 2024, and Plaintiff moved the state court below to enjoin Defendant just over a month later. (*See* Dkt. 17-11.) The court finds both that Plaintiff has provided a sufficient explanation for its delay in seeking an injunction and has demonstrated that it is indeed facing an irreparable injury as discussed above. *See Car Body Lab Inc. v. Lithia Motors, Inc.*, No. 21-cv-21484-MORENO/GOODMAN, 2021 WL 2652774, at *11 (S.D. Fla. June 21, 2021) ("An explanation, in and of itself, will not automatically and necessarily justify a significant delay; it must be a good explanation" (emphasis omitted) (citing *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995))); *Advanced Commc'n Design, Inc. v. Premier Retail Networks, Inc.*, 46 F. App'x 964, 984 (Fed. Cir. 2002) ("[W]e excuse delayed requests for Rule 65 relief when . . . the movant has offered a good explanation for the delay." (quotation omitted)).

### C. Balance of Hardships

In addition to a substantial likelihood of success on the merits and irreparable injury, a plaintiff seeking injunctive relief must also show that "the threatened injury to the movant outweighs whatever danger the proposed injunction may cause the opposing party." *McDonald's*, 147 F.3d at 1306. Such a showing is generally easily made in trademark infringement claims once the first two elements have been satisfied. *See Parsons v. Regna*, No. 6:20-cv-123-Orl-37LRH, 2020 WL 3266555, at *9 (M.D. Fla. Mar. 20, 2020) ("In trademark cases, courts have frequently found the balance of hardships favors plaintiffs." (collecting cases)). This is because the party opposing the injunction "would suffer no legitimate harm since the preliminary injunction would only prevent them from using marks which they are not entitled to use." *Clayton v. Howard Johnson Franchise Sys., Inc.*, 730 F. Supp. 1553, 1561–62 (M.D. Fla. 1988).

While this is true of trademark-infringement plaintiffs generally, it is true of Plaintiff specifically because of the goodwill it has developed in its mark over the past decade, which will be harmed if Defendant is permitted to use its confusingly similar mark. *See Mont. Pro. Sports, LLC v. Leisure Sports Mgmt.*, 422 F. Supp. 2d 1271, 1282 (M.D. Fla. 2006) ("The balance of hardships favors [the plaintiff] because of the goodwill associated with the Outlaws Marks. The Outlaws Marks have been extensively sued, promoted[,] and advertised since 2001 . . . ."). Though Defendant argues to the contrary, it offers no caselaw in support, and thus has effectively waived the issue. *See Hamilton*, 680 F.3d at 1319.

### D.  Public Interest

Finally, Plaintiff must prove that the injunction sought would not be adverse to the public interest.  *McDonald's*, 147 F.3d at 1306.  In trademark cases, an injunction "to enjoin infringing behavior serves the public interest in protecting consumers from such behavior."  *Parsons*, 2020 WL 3266555, at *9 (quoting *Nike, Inc. v. Leslie*, No. 85-960 CIV-T-15, 1985 WL 5251, at *1 (M.D. Fla. June 24, 1985)).  The Eleventh Circuit, in reaffirming the notion that "in 'ordinary trademark infringement actions . . . complete injunctions against the infringing party are the order of the day,'" reasoned that "the public deserves not to be led astray by the use of inevitably confusing marks—even in cases in which more than one entity has a legal right to use the mark."  *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (quoting *SunAmerica Corp. v. Sun Life Assur. Co. of Can.*, 77 F.3d 1325, 1336 (11th Cir. 1996)).  While Defendant argues that the public would be "disserved" by an injunction that would "restrain[] the lawful business practices of a well-established company," to enjoin its infringing use of Plaintiff's trademark is not to enjoin its otherwise lawful business activities.  (Dkt. 28 at 18.)  Were an injunction to issue, Defendant would still be free to offer its services—it would only be enjoined from violating Plaintiff's rights in its trademarks.  *See Buffets, Inc. v. LVDC II Inc.*, No. 8:11-cv-00035-T-30MAP, 2011 WL 13302716, at *7 (M.D. Fla. Feb. 15, 2011) ("In this instance, the issuance of a preliminary injunction would serve the public interest by enforcing and upholding the value of Plaintiff's trademark rights, ensuring fair

competition, and, most importantly, preventing customer confusion and deception in the marketplace.").

Plaintiff has satisfied the four prerequisites, and the court will grant its Motion as to its trademark infringement claims. *See Carillon Importers*, 112 F.3d at 1126.

### E. Bond

The parties disagree concerning whether the court should impose a bond upon the issuance of the injunction. While Plaintiff contends that no bond is necessary, Defendant seeks a $5 million bond. (*See* Dkt. 16 at 19; Dkt. 28 at 18–19.) Federal Rule of Civil Procedure 65(c) states that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." While the only caveat Rule 65 expressly makes to this requirement is for the United States and its officers and agencies, courts have found that, in some cases, a bond need not be required at all. Fed. R. Civ. P. 65(c); *see BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well-established that the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court, and the court may elect to require no security at all."). This appears to be especially true where, as here, the court finds that the movant enjoys a "high probability of succeeding on the merits of its Lanham Act claims." *TracFone Wireless, Inc. v. Washington*, 978 F. Supp. 2d 1225, 1235 (M.D. Fla. 2013).

In any event, courts are not required to engage in speculation in setting a bond amount, and the burden is on the party seeking a bond to establish a basis grounded in reality to support its proposed bond. *See Design Pallets, Inc. v. Shandon Valley Transp. Sols. USA, LLC*, No. 6:12-cv-669-Orl-22DAB, 2012 WL 13102590, at *2 ("In fixing the amount of security required, a court is not required to order security in respect of claimed economic damages that are no more than speculative. Moreover, the burden is on the party seeking security to establish a rational basis for the amount of the proposed bond." (quotation omitted)). In its briefing in opposition to the Motion, Defendant stated generally that the cost of rebranding its business would impose significant costs, and so requested a $5 million bond. (Dkt. 28 at 18–19.) However, Dagan testified at the hearing that the cost of rebranding would be closer to $1 million. (Hr'g Tr. 127–28.) Plaintiff, on the other hand, requests that the court "waive the bond requirement or require a minimal bond." (Dkt. 16 at 19.)

Given the lack of briefing on this issue and the wide divergence on the proposed bond amounts, the court will order the parties to confer to see if they can agree to a reasonable bond amount. *See BellSouth Telecomms.*, 425 F.3d at 971 (discerning no abuse of discretion where a district court declined to set a bond amount at the time it entered a preliminary injunction but instead ordered the parties to confer "regarding the 'bond issue'").

## CONCLUSION

Accordingly:

1. Plaintiff's Motion for Preliminary Injunction (Dkt. 16) is **GRANTED in part and DENIED in part**.  Plaintiff's Motion is granted as to its claims of trademark infringement.  Otherwise, Plaintiff's Motion is denied.

2. Defendant and its agents, employees, servants, privies, successors and assigns, and all persons acting in concert, participation, or combination with them, are preliminarily enjoined from:

   a. Using the ASPIRE mark or any colorable imitation thereof upon any signage, awnings, billboards, products, product containers, advertising or promotional materials, either in print, broadcast, or electronic form or other forms, either separately or compositely with other words, symbols, or devices, as a corporate or trading name or as a trademark, in connection with any healthcare, nursing home, and post-acute care services;

   b. Imitating in any way the ASPIRE mark for the purpose of acquiring Plaintiff's trade and goodwill by imitation, fraud, mistake, or deception;

   c. Using the domain name www.aspirehealthgrp.com or any other domain name that includes the word "Aspire."

   d. Further infringing the rights of Plaintiff to the ASPIRE mark or name, or otherwise damaging Plaintiff's goodwill or business reputation.

3. Within thirty (30) days of the date of this Order, Defendant is **DIRECTED** to file with the court and serve on Plaintiff a written report, under oath, setting forth in detail the manner and form in which Plaintiff has complied with these directives, as provided by 15 U.S.C. § 1116(a).

4. On or before January 10, 2025, the parties shall confer regarding the bond issue. If the parties are able to reach an agreement regarding the amount of the bond to be imposed, the parties shall notify the court in a writing on the docket of the agreed amount on or before January 13, 2025. If the parties cannot agree, each party shall file briefs not to exceed 5 pages regarding the bond issue on or before January 17, 2025.

**ORDERED** in Orlando, Florida, on December 19, 2024.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record